J-S28014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1715 MDA 2017 |

Appeal from the Order entered October 12, 2017
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  92 AD 2017,
CP-22-DP-0000072-2016

BEFORE:  OLSON, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                                **FILED JULY 05, 2018**

J.W. ("Mother") appeals from the decree and order dated October 10, 2017, and entered October 12, 2017, granting the petition filed by the Dauphin County Children, Youth and Families ("CYF" or the "Agency") seeking to involuntarily terminate her parental rights to her minor, male child, M.A.W., Jr., ("Child") (born in February of 2016) with  C.W. ("Father"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b), and to change Child's permanency goal to adoption, pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We affirm.

_____

[1] Father executed a consent to adoption of Child on July 19, 2016.  On October 12, 2017, the trial court entered a decree voluntarily terminating his parental rights to Child and changing Child's permanency goal to adoption.  Father is not a party to the instant appeal nor has he filed a brief in this appeal. Likewise, he has not filed an appeal in this matter.

On July 26, 2017, the Agency filed a petition to involuntarily terminate Mother's parental rights to Child and to change Child's permanency goal to adoption, and a petition for the voluntary termination of Father's parental rights and to confirm his consent. On July 28, 2017, the trial court scheduled the hearing on the petitions to occur on October 10, 2017.

On October 5, 2017, Attorney Joy Waters Fleming, Child's legal counsel and guardian *ad litem* ("GAL") from the dependency proceedings, filed a motion for her to serve as Child's legal counsel and GAL for purposes of the involuntary termination/goal change proceedings. In the motion, Attorney Waters Fleming averred that, after assessment and review of the matter, she did not believe that a conflict of interest existed by her representation of Child as both his legal counsel and his GAL in the termination and goal change proceedings. In fact, Attorney Waters Fleming averred that Child's best interests would be served through her representation of Child's legal interests as his legal counsel, and his best interests as his GAL. Attorney Waters Fleming stated that the Agency's counsel, Attorney Owen Hoover, had no opposition to her motion, and that Mother's counsel, Attorney Damian DeStefano, had not responded with any position. Prior to the commencement of the hearing on October 10, 2017, the trial court granted Attorney Waters Fleming's motion.

In *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality) (initially filed on March 28, 2017), our Supreme Court held that section

2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. The **L.B.M.** Court did not overrule this Court's holding in **In re K.M.**, 53 A.3d 781 (Pa. Super. 2012), that a GAL who is an attorney may act as counsel pursuant to section 2313(a) as long as the dual roles do not create a conflict between the child's best interest and legal interest.

In the instant case, in the October 10, 2017 order, the trial court appointed Attorney Waters Fleming to represent Child as his GAL and legal counsel. Our review of the record, discussed *infra*, reveals there is no conflict between Child's legal and best interests.[2] Therefore, we do not remand this matter. **Cf. In re T.M.L.M.**, 2018 PA Super 87 (filed April 13, 2018) (remand for further proceedings when six-year-old child's preference was equivocal and attorney serving as guardian *ad litem* neglected to interview the child to determine whether legal and best interests were in conflict).

At the hearing, the Agency presented the testimony of Rebecca Moore, a previous caseworker for the Agency; Pamela Haddad, the executive director of Samara, a program designed to interrupt generational child abuse and neglect; Rebecca Tweet, a supervisor for the Agency; and psychologist Howard Rosen, Ph.D., who had evaluated Mother. Mother testified on her own

---

[2] Child is currently two years of age.

behalf. Attorney Heather Paterno appeared, with the trial court's permission, in place of Attorney Waters Fleming as the legal counsel and GAL for Child. She cross-examined Ms. Haddad, Ms. Tweet, Mr. Rosen, and Mother. Attorney Hoover re-called Ms. Moore on direct testimony. Attorney DeStefano cross-examined Ms. Moore, as well as Ms. Haddad, Ms. Tweet, and Dr. Rosen.

Based on the testimonial and documentary evidence, the trial court set forth the factual background and procedural history of this appeal, and made findings, as follows:

> M.A.W., Mother's sixth child, was first placed in the temporary care of the Agency on March 7, 2016[,] following a referral concerning M.A.W.'s presentation at the emergency room with respiratory ailments and aspiration during feedings. (N.T. p. 39; Petition for Goal Change to Adoption and Involuntary Termination of Parental Rights, para. G) ("Petition"). Mother has four other living children. (N.T. pp. 37-38). Mother's fifth child, born with multiple medical complications including gastroesophageal reflux disease and sleep apnea, died unexpectedly while in Mother's care. (Petition, para. G). Mother voluntarily relinquished rights to two children. (N.T. 38). Mother's rights were terminated as to two other children. *Id.* All four children have been adopted. *Id.*
>
> On March 30, 2016, a Dauphin County Juvenile Court Hearing Examiner conducted an Adjudication and Disposition hearing at which the Agency sought a finding of Aggravated Circumstances based upon the prior involuntary termination of parental rights as to two children. (N.T. p. 40). By Order filed March 30, 2016, the [trial court] granted the request for a finding of Aggravated Circumstances. []*Id.*[]. Although the [trial court] ordered the finding of Aggravated Circumstances, the Agency established Service Objectives and continued to monitor Mother's progress on those [o]bjectives. Following the July 23, 2016 Permanency Review hearing, the [trial court] ordered the Agency relieved of providing further reasonable efforts to reunify Mother with M.A.W.
>
> The Service Objectives and Mother's achievement of those objectives are as follows:

1. Cooperate and comply with Service Objectives.

Mother returned phone calls from the Agency.  (N.T. pp. 75-76).  Mother missed 13 of 20 medical appointments which related to crucial health concerns of M.A.W.  (N.T. pp. 76-77).

2. Attend all court hearings, Agency meetings and treatment plan meetings.

Mother complied with this objective.  (N.T. p. 77).

3. Sign all releases of information requested by the Agency to ensure compliance with the service objective of obtaining mental health counseling.

Mother provided releases as to two providers.  However, the Agency was unaware that Mother received mental health treatment from a third provider, Pressley Ridge.  (N.T. p. 78).

4. Notify the Agency of any change in residence or contact information.

Mother has not changed her residence or contact information.  (N.T. p. 79).

5. Reimburse Dauphin County for support related to M.A.W.'s placement.

Mother has been relieved of this service objective because she is unemployed.  (N.T. 79).  Mother relies solely upon public assistance.  (N.T. pp. 79-80).

6. Obtain and maintain stable and clean housing suitable for M.A.W.

Mother resides in public housing.  Agency caseworker Ms. Tweet visited the residence in June 2017.  She knocked on the door and could hear movement inside, but no one answered the door.  (N.T. p. 80).

7. Participate in all medical appointments for M.A.W., [and] demonstrate an understanding of his medical needs and an ability to provide for M.A.W.'s basic and specialized care needs.

Mother has missed a majority of M.A.W.'s medical appointments. Mother is unable to demonstrate the ability to recognize signs of M.A.W.'s medical issues relating to his eyes and gastrointestinal function. (N.T. pp. 70-71; p. 82).

8. Maintain regular contact with M.A.W.

Mother attended supervised visits at Samara. (N.T. 82).

9. Maintain communication with the Agency caseworker and foster parents in order to assist in planning to meet the needs of M.A.W.

Mother failed to maintain communication with foster parents regarding medical decisions and M.A.W.'s overall well-being. (N.T. 83). Mother failed to make notes of M.A.W.'s feedings to enable the foster parents to track his dietary needs and gastrointestinal concerns. (N.T. 84).

10. Participate in weekly visits with M.A.W. and demonstrate, under supervision, that Mother can appropriately care for M.A.W.'s special needs.

Mother participated in intensive parenting programs, children's programs and a therapeutic visitation program at Samara. (N.T. pp. 11-12). Mother first participated in an intensive parenting program in August 2013 related to another of her children, [sic] who has been adopted. (N.T. p. 13). Mother returned to Samara on May 14, 2016 to participate in therapeutic visitation, parenting classes and a parenting support group. (N.T. p. 14). Mother completed the parenting education class three times. (N.T. pp. 15-16).

Although Mother participated in the visitation program for seventeen months, Mother failed to progress to the final phases of pre-home visits and in-home visits. (N.T. pp. 15-18). Pam Haddad, director and founder of Samara, testified that Mother is extremely strong-willed such that her desire to be right in all circumstances renders a young child in her care vulnerable. (N.T. p. 18; N.T. pp. 20-21). For example, in one visit, Mother insisted that M.A.W. eat, although he did not want to do so. (N.T. p. 21). In another, Mother insisted that his car seat straps were not properly adjusted, although she was sure they were.[sic] Mother having changed the straps to an incorrect position without telling

anyone. (N.T. pp. 56-57). M.A.W. rode to the foster parents' home with the straps in an incorrect position. Mother demonstrates an unwillingness to accept information which conflicts with her thinking. (N.T. p. 21).

Although Mother progressed somewhat in her ability to maintain M.A.W.'s safety during supervised visits, concerns remained about her ability to do so unsupervised. Mother lacks a healthy support system. (N.T. pp. 18-19; N.T. p. 33). One of her only supports is M.A.W.'s father, [C.W.], who has a history of inappropriate sexual contact with children. (N.T. p. 18). On one occasion, Samara staff dissuaded Mother from going out of town with Father and M.A.W. (N.T. p. 19; N.T. p. 33). Mother continues to rely upon Father for transportation. (N.T. p. 19).

Ms. Haddad concluded that Mother demonstrates an inability to make sound judgements [sic] regarding M.A.W.'s safety outside a supervised setting. (N.T. 33-34).

11. <u>Demonstrate adequate knowledge and skills related to age-appropriate child development milestones as well as the knowledge and hands-on ability to care for M.A.W.'s special needs consistently and appropriately</u>.

Although Mother completed three parenting courses, it remains necessary for Mother to have the assistance of a capable 24-hour caregiver, whom she has been unable to identify. (N.T. p. 86; N.T. p. 88).

12. <u>Participate in an approved parent-child interactive curriculum to demonstrate increased knowledge, skill and motivation to provide age-appropriate care and supervision specific to the needs of M.A.W</u>.

Although Mother completed the attendance requirement of this service objective, she remains unable to demonstrate the ability to independently implement effective parenting techniques. (N.T. p. 87). During some visits, Mother was unable to independently sooth [sic] M.A.W. without becoming frustrated. (N.T. p. 92).

13. <u>If Mother resumes a relationship with Father, she will participate in a parenting treatment program[,] which enables her to identify any potential concern for sexual misconduct and</u>

<u>domestic violence in order to safeguard M.A.W. while he is in her care</u>.

Mother remains in contact with Father. Mother has not participated in this treatment program. (N.T. pp. 87-88).

14. <u>Follow-up with the recommendations based upon the psychological evaluation of Lawrence [sic] Rosen, Ph.D</u>.

Dr. Rosen administered a comprehensive evaluation of Mother which included an intelligence test administered in 2013, the Adult-Adolescent Parenting Inventory, and the Minnesota Multiphasic Personality Inventory. (N.T. p. 102).

Mother's intelligence test score of 72 reflects that[,] although persons in this range of intellectual function can typically maintain marginal employment to enable them to have a home and a car, the demands of social, economic or childcare stresses create a significant challenge. (N.T. p. 103).

The results of the personality inventory, specifically, the deception scales, reflected an extreme score of 87, significantly above the average score. (N.T. p. 104). Dr. Rosen opined that this result indicated Mother's effort to present an "almost saintly" picture of herself. (N.T. pp. 104-105). Dr. Rosen deemed the score significant to Mother's ability to care for a young child in that such scores correlate with personality traits of hostility, anger and resentment. (N.T. p. 105).

Dr. Rosen concluded that Mother tends to pity herself, blame others and act impulsively or recklessly for her own gratification. (N.T. pp. 105-106). Mother has difficulty showing warmth and tends to resent authority figures who place demands upon her. (N.T. 106).

Testing also reflected that Mother suffers from depression. Based upon these personality traits, Dr. Rosen concluded that the [M]other's prognosis for compliance with therapy is poor. (NT. pp. 107-108).

Mother's scores on the Adult-Adolescent Parenting Inventory reflected a moderate risk of child abuse or neglect based upon her lack of understanding of child development

expectations, empathy toward children and understanding of alternatives to corporal punishment. [(]N.T. p. 109).

In forming his recommendations, Dr. Rosen considered information regarding Mother's own disruptive childhood, psychiatric hospitalizations and history as a victim of sexual assault. (N.T. p. 110). Around the time of the evaluation, Mother lived with the person who assaulted her[, *i.e.*, her husband, Father,] and his girlfriend. (*Id.*).

In view of these findings, Dr. Rosen concluded that Mother lacks the ability and experience to care for M.A.W. without the supervision of a capable person. (*Id.*) Dr. Rosen opined that reuniting Mother with M.A.W. without such [a] person would place M.A.W. at a very high risk of harm. (N.T. p. 111).

Mother has failed to complete outpatient mental health counseling to address problems with anger and learn coping and decision-making skills. (N.T. p. 73).

The Agency considered the recommendations of Dr. Rosen that Mother identify an appropriate caretaker. (N.T. p. 71). Mother has not done so. (N.T. p. 71). Although she has attempted to distance herself from him, Mother remains in a relationship with Father. (N.T. p. 73). Mother's lifestyle remains unstable in that she has not maintained employment. (N.T. p. 72). Mother remains unable to understand cues as to M.A.W.'s needs, a significant concern in view of M.A.W.'s medical concerns. (N.T. p. 74).

Agency caseworker Rebecca Tweet testified that barriers to reunification remain: Mother's insistence upon maintaining a position even when detrimental to M.A.W.'s medical needs. (N.T. p. 70).

Ms. Tweet testified to her conclusion that the change of the permanency goal to adoption best serves M.A.W.'s best interest. (N.T. p. 90). Mother has been unable to demonstrate the ability to anticipate M.A.W.'s needs, provide protection and meet parenting challenges. (N.T. p. 99). Overall, Mother has made little progress since M.A.W. came into the Agency's care in March 2016. (N.T. p. 98).

Trial Court Opinion, 1/19/18, at 1-8 (emphasis in original).

On October 12, 2017, the trial court entered the decree and order granting the petition to involuntarily terminate Mother's parental rights to Child pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b), and changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. Moreover, in its decree and order, the trial court found that the Agency had provided reasonable efforts to finalize the permanency plan in effect.

On November 6, 2017, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, from the decree and order. In her brief on appeal, Mother raises the following issues:

> 1. Whether the trial court abused its discretion in changing the goal to adoption?
>
> 2. Whether the trial court committed reversible error by terminating [Mother's] parental rights?

Mother's Brief, at 7.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel*

- 10 -

> **Bassett v. Kia Motors America, Inc.**, 34 A.3d 1, 51 (Pa. 2011); **Christianson v. Ely**, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-827 (Pa. 2012) (parallel citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.**, quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will focus on section 2511(a)(2) and (b), which provide, in relevant part, as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Although the trial court focused its discussion on section 2511(a)(8) and (b), we will discuss only section 2511(a)(2) and (b). Our Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (*quoting* *In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827 (parallel citations omitted).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal

cannot or will not be remedied. **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. **In re A.L.D.** 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **Id.** "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **Id.** at 340.

The trial court stated as follows:

We found that the Agency met its burden of proof and that termination of Mother's parental rights was proper.

The record establishes by clear and convincing evidence that[,] for an unreasonable time, Mother failed to remedy the conditions which led to placement[,] although services and opportunities to do so were made readily available to her.

\* \* \*

In considering whether the party seeking termination has satisfied these provisions, the appellate court keeps in mind that a parent has an affirmative duty to work towards the return of his or her children. **In re Adoption of J.J.**, 515 A.2d 883, 889 (Pa. Super. 1986). At a minimum, that "affirmative duty requires that the parent show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." **Id.** In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled his obligations; the court must further measure the parent's

- 14 -

performance in light of what would be expected of any individual under similar circumstances. **Matter of M.L.W.**, 452 A.2d 1021, 1023-24 (Pa. 1982) (citations omitted). . . .  The Superior Court has explained:

> The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated.
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child.  A child needs love, protection, guidance and support.  These needs, physical and emotional, cannot be met by a merely passive interest in the development pf the child.  Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> * * *
>
> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.  Parental rights are not preserved by waiting for a more suitable time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

**In re K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008).

[]The record reflects that M.A.W. was removed from Mother's care on March 7, 2016 and has remained in foster care since that time. More than 12 months have elapsed since the date of placement.

Next, the record overwhelmingly establishes that the conditions which led to removal continue to exist.  Although Mother complied with some of the objectives, she has failed to demonstrate the ability to independently and safely care for and parent M.A.W. long term.  Rather, Mother has often opposed and defied those who seek to enable her to accomplish those goals.  In spite of the benefit of supports and services for an extended period of time

- 15 -

which predated M.A.W.'s removal, Mother made little, if any[,] sustained progress in acquiring skills necessary to properly parent M.A.W.

We emphasize that we reach this conclusion as to termination not upon the fact of Mother's intellectual challenges, but[,] rather, Mother's inability to overcome obstacles to safely parent M.A.W., even with more than twelve months of services.

In so determining, we gave significant weight to the testimony of Dr. Rosen. We were persuaded by Dr. Rosen's conclusion that Mother tend [sic] to pity herself, blame others and act impulsively or recklessly. (N.T. pp. 105-106).

We also considered that Mother's challenges continued to exist even though she has received parenting education since approximately 2013. We considered the fact of the termination of parental rights to her other children relevant to Mother's lack of ability to achieve independence in parenting, in spite of many years of receiving services.

Trial Court Opinion, 1/19/18, at 9-12 (emphasis in original).

After a careful review of the record, this Court finds that the trial court's conclusion that Mother has demonstrated a repeated and continued incapacity, abuse, neglect or refusal that has caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother, is supported by competent, clear and convincing evidence. ***In re Adoption of S.P.***, 47 A.3d at 826-827. Thus, we find no abuse of discretion in the trial court's termination of Mother's parental rights to Child pursuant to section 2511(a)(2). ***Id.***

Next, we proceed to review whether there was sufficient evidence to support the termination of Mother's parental rights under section 2511(b) and

the goal change to adoption, as, in its opinion, the trial court discussed the goal change issue with section 2511(b). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (parallel citations).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Our standard of review in a dependency case follows:

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

***In Interest of: L.Z.***, ***A Minor Child***, 111 A.3d 1164, 1174 (Pa. 2015).

Regarding the disposition of a dependent child, sections 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007), *citing* 42 Pa.C.S.A. § 6351(f).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

**(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant

- 19 -

evidence presented at the hearing, the court shall determine one of the following:

* * *

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. ***See In re Sweeney***, 574 A.2d 690, 691 (Pa. Super. 1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S.A. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." ***In re E.F.V.***, 461 A.2d 1263, 1267 (Pa. Super. 1983) (citation omitted).

***In re K.C.***, 903 A.2d 12, 14-15 (Pa. Super. 2006).

With regard to section 2511(b), the trial court provided the following

discussion:

Best Interests Analysis

Having found that the Agency provided the statutory grounds for termination of parental rights under 23 Pa.C.S.A. § 2511(a), we undertake a separate "best interests" analysis. Pursuant to Section 2511(b), a court must give ["]primary consideration to the [developmental], physical and emotional] needs and welfare of

the child." *In re J.E.*, 745 A.2d 1250, 1254-1255 (Pa. Super. 2000) (*citations omitted.*)

\* \* \*

In addition, while "Section 2511(b) does not explicitly require a bonding analysis, analysis of the emotional bond, if any, between a parent and a child is a factor to be considered in determining the developmental, physical and emotional needs and welfare of the child under § 2511(b)." *In the Matter of K.K.R.-S., K.M.R., K.A.R.*, 958 A.2d 529, 533 (Pa. Super. 2008). The Superior Court has explained,

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent child bond, paying close attention to the effect of permanently severing the bond.

*In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006).

Dr. Rosen testified that removal of M.A.W. from the family he has known since birth would cause significant disruption in his life. (N.T. p. 111). M.A.W.'s needs have been and are being met in the foster home. Since his birth, M.A.W.'s foster parents have attended all of his medical appointments and demonstrated knowledge of his medical and developmental needs. (N.T. p. 91). Ms. Tweet described their knowledge of his medical needs as "amazing." *Id.*

We do not doubt that Mother loves M.A.W. However, we see no evidence of a bond with Mother which, if broken, would cause detriment to M.A.W. To the contrary, continued lack of permanency with the potential of removal from a capable and loving home would be contrary to M.A.W.'s interests. In deciding the issue of the best interest of a child, we have noted that it is essential to allow a child "a chance to have his fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, he might again be wrenched away from his committed and capable caregiver." *In re N.C.*, 763 A.2d 913, 919 (Pa. Super. 2000).

For all these reasons, the Decree of Goal Change to Adoption and Involuntary Termination of Parental Rights should be affirmed.

Trial Court Opinion, 1/19/1, at 12-14 (emphasis in original).

Here, the trial court considered section 2511(b). It determined that, based on the competent evidence in the record, the termination of Mother's parental rights would serve Child's best interests and there is no bond between Child and Mother that, if broken, would cause detriment to Child. ***In re: T.S.M.***, 71 A.3d at 267. The court also found, based on competent evidence in the record, that a change of permanency goal for Child to adoption was best suited to the safety, protection and physical, mental and moral welfare of the child. ***See*** 42 Pa.C.S.A. § 6351.

Accordingly, we find no abuse of the trial court's discretion in terminating Mother's parental rights to Child and changing Child's permanency goal to adoption. We, therefore, affirm the decree and order.

Decree and order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/05/2018